IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BENJAMIN A. SIFRIT, | * | |
| Petitioner, | | |
| v. | * | CIVIL ACTION NO. RDB-08-2327 |
| JOHN A. ROWLEY, et al., | * | |
| Respondents. | | |
| | *** | |

## MEMORANDUM OPINION

Before the Court is a Petition for habeas corpus relief filed by Benjamin A. Sifrit, (Paper No.

1); Respondents' Answer (Paper No. 11); and Petitioner's Reply thereto. (Paper No. 12). After

review of these documents, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules*

*Governing Section 2254 Cases in the United States District Courts.* For the reasons to follow, the

Petition will be denied and dismissed with prejudice.

### Factual History

The facts adduced at trial, as described by the Court of Appeals of Maryland, are as follows:

> On Friday, May 24, 2002, Martha Crutchley and her boyfriend, Joshua
> Ford, drove from Virginia to Ocean City, Maryland, for the Memorial Day
> weekend. Erika and her husband Benjamin were also vacationing in Ocean
> City over the holiday weekend. On Saturday night, May 25, 2002, the Sifrits
> met Ms. Crutchley and Mr. Ford on a bus on their way to Seacrets, a popular
> Ocean City nightclub. The Sifrits did not have the exact change for the fare so
> Ms. Crutchley and Mr. Ford offered to pay the Sifrits' fare if they would buy
> them a drink when they arrived at Seacrets. The foursome and two other
> people from the bus, friends Anne Carlino and Jeff Hysee, spent the rest of the
> evening together at Seacrets.

> What happened in the early morning hours following the night at
> Seacrets is unknown. We do know, however, that at 3:00 a.m. on Sunday, May
> 26, 2002, Erika called 911 claiming that people she did not know were in her
> condominium unit and she could not find her purse. She was "afraid I'm going

1

to have a robbery here." The call abruptly ended and no one was dispatched to the condominium.

On Tuesday, May 28, 2002, one of Ms. Crutchley's co-workers notified the Fairfax City police that Martha Crutchley failed to show up at work following the Memorial Day weekend. Fairfax City police contacted the Ocean City police who found Ms. Crutchley's car outside the condominium where she and Mr. Ford were staying for the weekend. The police found the couple's belongings left in their condominium as if they had just stepped out. Concerned about Ms. Crutchley and Mr. Ford, the police began to search actively for them.

On May 31, 2002, around midnight, the Ocean City Police Department responded to an alarm call from the closed-for-the-night Hooters Restaurant and Bar merchandise store on 122nd Street in Ocean City. There they found Erika and Benjamin loading Hooters merchandise into their Jeep Cherokee. The couple were placed in handcuffs. Upon searching the couple, the police found a 9 millimeter handgun and a knife on Benjamin and a fully-loaded .357 magnum revolver tucked into Erika's blue jeans in the small of her back. Another knife was found on Erika. Discovered in the Sifrits' car were a .45 caliber gun, ski masks, flex cuffs, and tape.[4] The two were arrested and charged with burglary.

At the scene of the burglary, Erika told the officers that she had anxiety problems and that she needed her Xanax and Paxil from a brown leather pouch in her purse located in the front of the Jeep. One of the police officers, Sgt. Beene, looked in Erika's purse for the pills. He found only one type of pill inside the brown leather pouch. Sgt. Beene continued to look for the other type of pill inside a red pouch because he noticed medicine bottles in that pouch. When the officer did not find the second type of pill in the red pouch he looked in a zippered pouch in the back of the purse. There he discovered four spent .357 magnum shell casings and one live round. The sergeant continued to look for the second type of pill in a gray change purse, also inside Erika's purse, and found the identification cards of Mr. Ford and Ms. Crutchley.[5] Fearing for the safety of Ms. Crutchley and Mr. Ford, the police ordered an immediate search of the Sifrits' condominium.

Upon entering the Sifrits' condominium, the police observed photographs and two bullets on a glass table. The pictures were of the Sifrits, Ms. Crutchley, and Mr. Ford, taken before the murders. Both of the bullets on the table had been fired from the .357 magnum recovered from Erika at Hooters, and one of the bullets had Mr. Ford's blood and tissue on it. Police also found a key to Ms. Crutchley and Mr. Ford's condominium on another table. Crime scene technicians found bloodstains in the Sifrits' master

2

bathroom on the top of the counter, the underside of the counter top, the floor, the floor under the vanity, the back side of the bottom drawer of the vanity, under the mirror, under the baseboard, under the hot tub faucet, on the hot tub step, on a sailboat candle holder on the hot tub, on the window, and in the shower. Swabs were taken from these bloodstains, which were all later identified as matching the DNA of either Ms. Crutchley or Mr. Ford. There was also a hole in the back wall of the bathroom, fresh paint on the wall, and numerous cleaning supplies on the floor next to the bathroom door. The cleaning supplies, it was later discovered, had been purchased on Sunday, May 26, 2002, the day after Martha Crutchley and Joshua Ford were murdered.

The police ultimately found the dismembered bodies of Martha Crutchley and Joshua Ford in a Delaware landfill. The only part of Ms. Crutchley that was recovered was her left leg, consequently, her cause of death was never determined. Police recovered the torso and both arms of Mr. Ford. Two bullets fired from the .357 magnum recovered from Erika at Hooters on the night of the burglary were found in Mr. Ford's torso.

The State's theory in both cases was that after leaving Seacrets that night, the two couples had returned to the Sifrits' condominium. Once in the condominium, the Sifrits engaged in a "missing purse game" in which they claimed Erika's purse was missing. They demanded the other couple find the purse and when it couldn't be found, somehow got them into the upstairs bathroom where both Sifrits shot Mr. Ford and in some other manner killed Ms. Crutchley. The team then cut up the victims' bodies and disposed of them in trash dumpsters.

The State's theory is based, in part, on the testimony of Melissa Seling ("Melissa") who met the Sifrits the night of May 29 through her friend, Justin Todd Wright ("Todd"). Melissa testified that when she caught up to Todd that night, he and the Sifrits were intoxicated and she was the only one who was sober. Melissa joined the Sifrits and Todd at a couple of bars, but she did not drink. At the end of the evening, Melissa was worried about Benjamin's ability to drive so she agreed to follow the Sifrits back to their condominium. When the four of them arrived at the condominium, Melissa, at Benjamin's urging, helped Erika up to the condominium because she seemed so intoxicated that she might fall over without help. Once at the door, Erika located her keys in her purse and opened the door with no problem. Erika began showing Melissa around the condominium. Within 5-10 minutes of having the purse at the door, Erika and Benjamin claimed that someone had taken Erika's purse and that Melissa had to look for it.

At some point during the search for the purse, Benjamin brandished a gun and became more adamant about them finding the purse. Benjamin made

a number of statements during the search regarding people who had been there before who had tried to rip them off and that he was "doing the world a justice by ridding the earth of bad people." Melissa testified that he also told her "if we ripped them off ... he would kill us the same way he killed those other people." In her statement to police and on re-cross-examination in Benjamin's trial, Melissa acknowledged that she was not clear in her recollection of whether Benjamin had said "just like *I* killed the other people" or "just like *we* killed the other people" (emphasis added). Melissa testified that she felt threatened by the gun and asked that it be put away. During the search, Melissa noticed a bullet hole in the bathroom door, which had been removed from its hinges. Ultimately, Benjamin discovered the purse in a location that had previously been searched. Benjamin also sat down with Melissa to show her his gun and what he called Erika's gun, the .357 magnum used to kill Joshua Ford.

At his trial, Benjamin took the stand in his own defense. He denied any involvement in the actual killing of the two victims. Benjamin testified that he left Seacrets with his wife, Martha Crutchley, and Joshua Ford and got on a bus. When the bus stopped at the condominium where Ms. Crutchley and Mr. Ford were staying, Erika got off the bus with them while Benjamin returned to their condominium alone. Once there, however, Benjamin realized he did not have a key to the unit, so he went and "passed out" in the couple's jeep. At some time later, Benjamin claims his wife woke him up in the car asking "why weren't you there for me?" The two then returned to the condominium where he found Joshua Ford and Martha Crutchley dead on the bathroom floor. Benjamin admitted that it was his idea to dismember the bodies and that Erika helped him. He testified that he cut off both Ms. Crutchley's and Mr. Ford's heads, arms, and legs about an hour after they were killed. He then placed their body parts in trash bags, which Erika purchased for that purpose that morning while Benjamin dismembered the bodies, and then dumped their remains in a dumpster at a Food Lion in Rehoboth, Delaware, at around 8 a.m. or 9 a.m. on Sunday, May 26, 2002.

---

[4]Investigators later found other items in the Jeep including but not limited to a knife, gloves, and undeveloped film.

[5]There was also a silver ring with a dragon engraving found in Erika's purse that was later identified as belonging to Mr. Ford. DNA testing revealed blood from both Joshua Ford and Martha Crutchley on the ring. Ms. Crutchley was a major contributor to the DNA sample found on the ring and Mr. Ford was a minor contributor, according to a forensic chemist for the State of Maryland.

Paper No. 11, Exhibit 17 at 7-9 (footnote six omitted).

## Procedural History

In June, 2002, Petitioner and his wife, Erika Sifrit, were charged, in the Circuit Court for Worcester County, Maryland with the murders of Martha Crutchley and Joshua Ford. Petitioner and Erika Sifrit were tried separately. Petitioner was tried first from March 31 to April 9, 2003, in the Circuit Court for Montgomery County, the Honorable Paul H. Weinstein presiding. Erika Sifrit was tried in June of 2003 in the Circuit Court for Frederick County. Paper No. 11., Ex. 1, 17 and 18. On April 9, 2003, the jury found Petitioner guilty of the second-degree murder of Martha Crutchley, first-degree assault of Martha Crutchley, and accessory after the fact. Paper No. 11, Ex. 9. He was acquitted of the remaining charges. On July 7, 2003, Petitioner pled guilty to second-degree burglary and carrying a dangerous weapon. *Id.*, Ex. 10. On that same date, Petitioner was sentenced to a thirty year term of imprisonment for second-degree murder, a concurrent term of twenty-five years in prison for first-degree assault, a consecutive five year term of incarceration for accessory after the fact, a consecutive three year term for second-degree burglary, and a concurrent three-year term for carrying a dangerous weapon. *Id.*, Ex. 9.

At the conclusion of Erika Sifrit's trial she was convicted of the first-degree murder of Joshua Ford, second- degree murder of Martha Crutchley, and theft charges related to the burglary at Hooters. *Id.*, Ex. 18. Erika Sifrit received a sentence of life imprisonment for first-degree murder, a consecutive twenty year term of imprisonment for the second-degree murder conviction, and a concurrent term of eighteen months for the theft charges. Erika Sifrit noted an appeal, alleging, inter alia, that the prosecution violated due process by pursuing inconsistent theories in the two trials. The

Court of Appeals of Maryland took the case prior to its review by the intermediate Court of Special Appeals of Maryland. *Id.*, Ex. 18.

On direct appeal Petitioner raised the following grounds: (1) whether the State violated the Petitioner's fundamental right to due process by presenting inconsistent factual [] theories at the Petitioner's trial and the trial of his wife, both of whom were charged with committing the same crimes (2) whether the trial court [erred] in admitting the testimony of Michael McInnis regarding a conversation that Petitioner had with McInnis three years before the murders as prior bad acts evidence (3) whether the trial court erred in refusing to allow the defense to present relevant evidence regarding Erika Sifrit's ability to commit the crimes alone; and (4) whether the trial court erred in imposing separate sentences for second-degree murder and first-degree assault? *Id.*, Ex. 11. Before the State responded, Petitioner filed a petition for writ of certiorari in the Court of Appeals asking the court to review his appeal concurrently with Erika Sifrit's. *Id.*, Ex. 12. The request was granted.

The Court of Appeals issued reported decisions in both cases on August 27, 2004. *Id.* Ex. 17 and 18. Regarding Petitioner, the court held that his first-degree assault conviction merged into his conviction for second-degree murder. His convictions were affirmed in all other respects. *Id.*

On August 26, 2005, Petitioner filed for post-conviction relief in the Circuit Court for Montgomery County, alleging that counsel was ineffective for failing to: (1) investigate the case; (2) file an application for review of sentence by a three-judge panel; (3) file a motion for modification or reconsideration of sentence; and (4) put into evidence Benjamin's statement "I do not know what happened, ask my wife." *Id.*, Ex. 19. On September 4, 2008, a counseled post-conviction hearing

was held in the Circuit Court. *Id.*, Ex. 2. At that time, Petitioner through counsel withdrew his petition. *Id.*

Petitioner's sole claim before this court is that "his right to due process was violated when the State presented materially inconsistent theories at Mr. Sifrit's trial and at the trial of his wife, Erika Sifrit. At Mr. Sifrit's trial the State argued that Petitioner killed the two victims and was in control of the events surrounding the victims' deaths. At the subsequent trial of Erika Sifrit, the State argued that Erika killed the two victims." Paper No. 1.

## Threshold Considerations

### Timeliness & Exhaustion of State Remedies

Respondents do not contend, and the Court does not find, that the Petition was filed outside the one-year limitations period set forth in 28 U.S.C. §2244(d)(1). Further, Petitioner no longer has any state direct review or collateral review remedies available to him with respect to the claim raised in this Court. His claim is exhausted for the purpose of federal habeas corpus review.

### Standard of Review

Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the State's adjudication on the merits:

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). A decision is "contrary to Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405

(2000).[1] Section 2254(d) also requires federal courts to give great deference to a state court's factual findings. *See Lenz v. Washington,* 444 F. 3d 295, 299 (4th Cir. 2006). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003). In sum, § 2254(d) imposes a "highly deferential standard for evaluating state-court rulings" and "demands that the state-court decisions be given the benefit of the doubt." *See Renico v. Lett,* __U.S.__, 130 S.Ct. 1855, 1862 (2010); *see also Woodford v. Viscotti,* 537 U.S. 19, 24 (2002). With these standards in mind, the Court will address the merits of Petitioner's claim.

---

[1]    Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy,* 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) (*per curium*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-410; *see also Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth,* 288 F.3d 571, 575 (4th Cir. 2002). A federal district court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly; rather, the state court application must be objectively unreasonable. *See Renico v. Lett,* __U.S.__, 130 S.Ct.1855, 1862 (2010).

# Analysis

Petitioner maintains that, in violation of his right to due process, the State took materially different positions during his trial and that of his wife. Paper No. 1. Specifically, Petitioner claims that in his trial the State argued that he had control of the murder weapon, a .357 caliber handgun, and was the primary perpetrator of the crimes. During Erika Sifrit's trial, the State argued that Erika was the owner and controller of the gun and that she was the primary perpetrator of the murders. Petitioner further maintains that other evidence relied upon during Petitioner's case, i.e. the testimony of McInnis, was "crucial" but was "relegated to a 'joke' or otherwise overlooked during Erika trial." *Id.*

Petitioner claim that his due process rights were violated by these inconsistencies was rejected by the Maryland Court of Appeals, as follows:

> The first question presented for our review is whether the State violated Erika's right to due process by presenting factually inconsistent theories of the case at her trial and that of her husband, Benjamin. This is a matter of first impression in this State. Other courts, however, have addressed the issue and in the vast majority of cases failed to find a due process violation. We likewise fail to find a violation here.

> The court that has addressed the issue of inconsistent theories the most is the United States Court of Appeals for the Ninth Circuit. It first addressed the issue briefly in the case of *Haynes v. Cupp*, 827 F.2d 435 (9th Cir.1987), in which Haynes relied on evidentiary and argumentative differences between his trial and that of a co-defendant to argue that his right to due process had been violated. Then Judge, now Justice, Kennedy wrote for the court that "[i]t is true that the trials differed in emphasis. However, the underlying theory of the case, that all three defendants were equally culpable, remained consistent throughout. In view of this underlying consistency, the variations in emphasis are not cause for reversal." *Id.* at 439.

> More than a decade later, that court was again presented with the question in *Thompson v. Calderon*, 120 F.3d 1045 (1997) (en banc ), rev'd on other

grounds, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). In *Thompson* two men were charged for the same murder. The court found that the prosecuting attorney had offered conflicting theories regarding the two men's motives for committing the crime. In Thompson's case, the State argued that Thompson had raped the victim and then killed her to cover up the rape. *Thompson*, 120 F.3d at 1056-57. In the second defendant's case, the State argued that he had killed her because he saw her as a threat to his ability to reconcile with his estranged ex-wife. *Id.* The State presented completely different witnesses in the two trials, who, in some instances, provided testimony that wholly contradicted the testimony given in the other trial. *Thompson*, 120 F.3d at 1057. Relying in part on their *Haynes* opinion, the court stated that "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Thompson*, 120 F.3d at 1058. The court continued, however, "when there are claims of inconsistent prosecutorial conduct, reversal is not required where the underlying theory 'remains consistent'" *Thompson*, 120 F.3d. at 1058-9 (quoting *Haynes*, 827 F.2d at 439). Applying this standard to Thompson's case, the court found that "little about the two trials remained consistent other than the prosecutor's desire to win at any cost." *Thompson*, 120 F.3d at 1059. The court held that Thompson's right to due process had been violated.

In *Shaw v. Terhune*, 353 F.3d 697 (2003), the Ninth Circuit again returned to the issue. Like in *Haynes*, the court found that there had not been a due process violation. Shaw and an accomplice were both convicted of several crimes arising from an attempted robbery. Despite the fact that the evidence established that only one person had personally used a firearm during the robbery, the prosecutor argued at both trials that the man currently on trial had been the one to use the firearm. *Shaw*, 353 F.3d at 699. The court reviewed its holding in *Thompson* and found it "sufficiently dissimilar to the instant case that it is distinguishable." *Shaw*, 353 F.3d at 702. The court noted that the *Thompson* case had rested on the "'peculiar facts' of the case." *Shaw*, 353 F.3d at 702 (quoting *Thompson*, 120 F.3d at 1059). "The prosecutor in Thompson did not merely suggest varying interpretations of ambiguous evidence; he 'manipulated evidence and witnesses, argued inconsistent motives, and in [the other defendant's] trial essentially ridiculed the theory he used to obtain a conviction and death sentence at Thompson's trial.'" *Shaw*, 353 F.3d at 702 (quoting *Thompson*, 120 F.3d at 1057). "By doing so, the prosecutor brought his conduct squarely within an area forbidden by the Supreme Court-the 'knowing [] present[ation of] false testimony.'" *Shaw*, 353 F.3d at 703 (quoting *Thompson*, 120 F.3d at 1058) (internal citations omitted) (alteration in original). Returning to the facts of *Shaw*, the court stated "[i]n this case, Shaw does not contend that the prosecutor

> presented false evidence, and in reality cannot do so, because the evidence
> was nothing more than ambiguous. The evidence presented at the two

trials was almost identical, and supported several critical conclusions...."
*Shaw*, 353 F.3d at 703. The Court concluded that

> [c]learly established federal law prohibits a prosecutor from
> "knowingly presenting false evidence;" it does not preclude that
> prosecutor from suggesting inconsistent interpretations of
> ambiguous evidence. When prosecutors confront truly ambiguous
> evidence that supports multiple convictions for what is inherently a
> unilaterally committed crime, there are competing concerns
> involved. In these situations, prosecutors must retain some amount
> of discretion to change theories in later trials.

> \* \* \*

> Since no clearly established federal law precludes a prosecutor
> from supporting two theories which are in tension with one another
> but which are each arguably supported by ambiguous evidence,
> Shaw's due process rights were not violated....

*Shaw*, 353 F.3d at 703, 705 (citing *Nguyen v. Lindsey*, 232 F.3d 1236 (9th
Cir.2000)).

The holding in *Shaw* is consistent with the Ninth Circuit case
*Nguyen v. Lindsey*, in which the court found that a defendant's right to due
process is not violated when a prosecutor uses inconsistent arguments at
separate trials, provided the arguments are consistent with the evidence
adduced at each trial and provided the prosecutor does not knowingly use
false evidence or act in bad faith.[18] *Id.* at 1240.

In *Thompson*, the Ninth Circuit relied, in part, on a concurring
opinion accompanying the en banc rehearing of an Eleventh Circuit case,
*Drake v. Francis*, 727 F.2d 990 (11th Cir.1984), rev'd on different grounds
en banc, *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985). In *Drake v.
Francis*, the defendant argued that by pursuing "wholly inconsistent
theories" in his and a co-defendant's trial, the prosecution violated his
right to due process. *Drake*, 727 F.2d at 994. Drake and a co-defendant
were charged and convicted of the murder and armed robbery of a barber
in Colbert, Georgia. In the co-defendant's trial the prosecutor argued that
the co-defendant committed the murder while Drake played a lesser role.
In Drake's trial, a year later, the prosecutor argued that the co-defendant
was too old and weak to have committed the murder by himself and that Drake
must have played a more significant role. The court found that "the only
inconsistent theory propounded in the two trials was that [the co-defendant's]

prosecutor believed [the co-defendant] was the sole murderer while in Drake's case, the district attorney urged that, due to sheer physical necessity, Drake must have participated in the attack as well." *Id.* "Viewed in this light," continued the court,"the two theories are fairly consistent and there was no due process violation." *Id.* On rehearing en banc, the majority of the court declined to reach the issue, instead granting relief on other grounds. *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (en banc ).

In *Smith v. Groose*, 205 F.3d 1045 (8th Cir.2000), *cert. denied, Gammon v. Smith*, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000), the United States Court of Appeals for the Eighth Circuit addressed the issue in the context of a prosecutor relying on two wholly inconsistent and irreconcilable statements made by the same witness. In the first of two trials in *Smith*, the prosecution relied on a statement by a witness that the victims were alive when they entered the house and that a colleague of the witness testifying had, in fact, killed the victims. *Smith*, 205 F.3d at 1048. In a subsequent trial of a different defendant, the prosecutor relied on a different statement made by the same witness that the victims were dead when they arrived at the house. *Id.* "In short, what the State claimed to be true in [the first case] it rejected in [the second case], and vice versa.... This before/after distinction is the heart of the prosecutorial inconsistency that allowed the State to convict as many defendants as possible in a series of cases in which the question of timing was crucial." *Smith*, 205 F.3d at 1050-1051. Although the court held that the actions of the State in this case "constituted foul blows ... that fatally infected Smith's conviction," the court also noted that "[w]e do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principle of due process." *Smith*, 205 F.3d at 1052. The court continued by noting that "Smith's situation is unusual, and we doubt that claims such as his will often occur. To violate due process, an inconsistency must exist at the core of the prosecutor's case against the defendants for the same crime." *Id.*

The theme requiring an inconsistency at the core of the state's case before finding a due process violation runs throughout the majority of cases that have addressed the issue. *Clay v. Bowersox*, 367 F.3d 993, 1004 (8th Cir. 2004) ("'To violate due process, an inconsistency must exist at the core of the prosecutor's cases against the two defendants for the same crime,' and the State's error must have 'rendered unreliable' the [petitioners] conviction."). *Id.* at 1004 (quoting *Smith*, 205 F.3d at 1052); *United States v. Paul*, 217 F.3d 989, 998-99 (8th Cir. 2000), *cert. denied*, 534 U.S. 829, 122 S.Ct. 71, 151 L.Ed.2d 37 (2001) ("When it

> cannot be determined which of two defendants' guns caused a fatal wound
> and either defendant could have been convicted under either theory, the

prosecutor's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since Paul could have been convicted of aiding and abetting under either theory, we find no error."); *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995), *cert. denied, Nichols v. Johnson*, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996) (Finding that where the facts support the conclusion that either defendant could have fired the fatal shot, the prosecutor did not violate due process by arguing at separate trials that the man on trial was the one responsible for the fatal shot.); *Illinois v. Caballero*, 206 Ill.2d 65, 276 Ill.Dec. 356, 794 N.E.2d 251, 264 (2002) ("We conclude that no due process violation has occurred in the present case when the State's shifting positions involved matters of opinion, not of underlying fact."); *Iowa v. Watkins*, 659 N.W.2d 526, 532 (Iowa 2003) ("We are convinced that [*Thompson* and *Smith*] only stand for the proposition that a selective use of evidence by the prosecution in order to establish inconsistent factual contentions in separate criminal prosecutions for the same crime may be so egregious and lacking in good faith as to constitute a denial of due process. We view those situations as a narrow exception to the right of the prosecution to rely on alternative theories in criminal prosecutions albeit that they may be inconsistent.... This right is particularly obvious in cases in which the evidence is not clear concerning which of two persons is the active perpetrator of the crime and which of them is an aider and abettor of the active perpetrator." (Internal citations omitted.)).

Based on our analysis of the relevant case law, we are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process. With this standard in mind, we return to the present case.

Erika relies primarily on four ways in which she believes the State's case differed in the two trials and in which she believes the differences rise to a violation of due process. They are: (1) ownership and possession of the murder weapon, (2) the testimony of Michael McInnis, (3) the testimony of Melissa Seling, and (4) the number of

shots fired by each of the Sifrits.

None of the differences in the two trials alleged by Erika go to the State's underlying theory of the case which remained consistent throughout both trials, which was that Benjamin and Erika committed the crimes together. The differences raised are differences in emphasis and inferences regarding certain facts tending to show the guilt of the defendant currently on trial, but in no way exculpating the other Sifrit. Evidence offered tending to show Benjamin's guilt is not necessarily relevant to show Erika's guilt. Provided the evidence remains consistent with the underlying facts, the inconsistent emphasis or inferences will not amount to a due process violation.

We begin with the issue of who owned the murder weapon. The evidence presented at the two trials established that both Benjamin and Erika had access to the murder weapon throughout the week. According to the evidence, Benjamin purchased the gun, apparently for Erika, both had possession of the gun at varying times during the week following the murders, and the two often exchanged their various weapons. Based on these facts, it is not inconsistent for the State to argue at Benjamin's trial that the murder weapon was his. Nor is it inconsistent[19] with the facts for the State to argue at Erika's trial that the weapon was hers. The facts and inferences support both conclusions. Furthermore, considering the facts established that the Sifrits often exchanged their weapons and both had access to the murder weapon, determining who actually "owned" it is of no consequence.

The same is true with regard to the issue of whether Erika fired one shot or two. In both trials the State recognized that no one besides Erika and Benjamin can know for certain who fired which bullet.[20] The facts established that four shots were fired from the .357 magnum. Two of the four shots were found in Mr. Ford's torso. The other two bullets were found on the table in the Sifrit's condominium, one with flesh on it that matched Mr. Ford's DNA. It was the State's consistent theory that both Sifrits were present for the murders and that both participated in them by actually shooting at Mr. Ford and by luring the couple up to the apartment. Whether Erika's participation in the murders is limited to firing one shot or two, or simply by aiding Benjamin in luring the couple to their deaths, does not affect her culpability. Under either theory a jury could find both participants guilty of murder. This distinction falls squarely within the permissible differences allowed in *Paul*, *Nichols*, *Caballero*, and *Watkins* discussed above.

Erika also argues that the State's characterization of the testimony of Michael McInnis ("McInnis") in the two trials amounted to a due process violation.

14

McInnis is a former Navy SEAL and friend of Benjamin. He was called by the defense at Erika's trial to recount a conversation that he had with Benjamin.

McInnis testified that in 1999 the two men were at a strip club having drinks when the discussion turned to how Benjamin would dispose of a body if he ever killed someone. The conversation arose when McInnis asked Benjamin to "whack" his wife for him, to which Benjamin allegedly responded "[y]eah, sure." McInnis asked what the going rate was for "whacking" someone, to which Benjamin responded around $30,000. According to McInnis, Benjamin stated that he would dispose of the body by laying down plastic in a living room or an open space and then remove the arms, legs and head with a knife. Then he would remove the body in separate bags and dispose of the body in either the same dumpster over the course of a month or in different dumpsters throughout the city in a single trip. McInnis testified that the conversation was a typical conversation between SEALs, that they were "simply talking trash with guys over a few beers," and that the conversation was not to be taken seriously.

Erika argues that the State took inconsistent positions in the two trials with regard to this testimony. In Benjamin's case, the State made reference to this evidence as "crucial," but in rebuttal closing remarks in Erika's trial the State argued:

> Michael McInnis told you as far as he was concerned, this was just guys talking over beer and nobody was serious about it. Now, that would sound easy if none of this other stuff had happened. Certainly it was a joke in McInnis's mind. In light of what happened this past Memorial day, perhaps it wasn't a joke in Benjamin Sifrit's mind. But, ladies and gentlemen, the important issue is not who quartered the bodies and put them in the dumpster, the important issue is who's responsible for their deaths?

We find Erika's argument unpersuasive. The question of whether Benjamin had thought about killing someone and how he would dispose of the dead body if he ever murdered someone is clearly more relevant to the State's case against Benjamin than it is to Erika's guilt or innocence in her role(s) regarding the murders. This is unlike *Thompson* where the prosecutor "essentially ridiculed the theory he used to obtain a conviction and death sentence in Thompson's

trial." Rather, McInnis's testimony established that Benjamin had considered committing almost the same type of crime three years before, not that he was incapable of committing the crime by himself. Furthermore, the question of whether the conversation was a joke is a matter of opinion, not fact. *See Illinois v. Caballero,* 206 Ill.2d 65, 276 Ill.Dec. 356, 794 N.E.2d 251, 264 (2002) ("We conclude that no due process violation has occurred ... when the State's shifting positions involved matters of opinion, not underlying fact."). The State's shifting position regarding whether McInnis's opinion that the conversation was a joke does not affect the core of the State's case and does not support a due process claim.

The final way in which Erika claims the State presented inconsistent theories is with regard to its reliance and interpretation of Melissa Seling's testimony at the two trials.

Melissa Seling was called as a State's witness against Benjamin and a defense witness in Erika's trial. At various points in Benjamin's trial, Melissa stated that Benjamin had told her that he was ridding the world of bad people, or that if they were "ripping them off, you know, he has had other people rip them off and if we ripped him off like the other people that were here, he would do the same thing to us that he did to them referring to the bullet hole in the door." On cross-examination in Benjamin's trial, the defense asked Ms. Seling "[y]ou are unsure whether or not he ever said he killed anyone, she killed anyone, or they both killed anyone; isn't that right, Ms. Seling?" To which she responded, "[n]o matter how you pick apart the words, he admitted to me throughout the night that in one way or another he was involved in the murder of these two people." Counsel then questioned her regarding her statement to the police shortly after the murders in which she said "[h]e was waving the gun around and making connotations to the people that they murdered and I am not sure if it was he murdered or she murdered or they both, you know, murdered them." The attorney asked if that was the truth at the time and she said it was still the truth. She eventually responded:

> He stated to me several times throughout the night that he was involved in these murders. Those ID's, those people, you know, with the bullet in the door and everything. You can't just pick words apart like that and try to shift the blame, you know. The two people were there that night, four people and only two came out and that is what this is about.

In its closing argument in Benjamin's trial, the State argued that Melissa:

> is the best witness in this case, and I don't say that just because her testimony helps the State a lot, but everybody

16

else in this case was so-had been drinking and Melissa had not.

* * *

> She told you the defendant told her, "If you're ripping us off, I'll do the same to you as I did to that other couple." He claimed he was ridding the earth of bad people. He admitted that he was involved in the killing of those two people, and he told her, "I don't overreact; I just react."

Later, in its rebuttal argument, the State argued:

> Melissa told you the truth. Melissa was under oath today. She was not under oath when she talked to the police. There is no testimony or evidence that they placed her under oath when they questioned her.

The State then argued that Benjamin had admitted to these murders and that he had opened his heart to Melissa in stating "I killed two people. I killed two people."

In Erika's trial, Melissa was called as a defense witness and aggressively examined. She testified essentially as she did at Benjamin's trial with the same uncertainty regarding whether Benjamin uttered "he killed, she killed, they killed." The defense, obviously, was emphasizing her statements in which she stated Benjamin had said he killed the people or words to that effect. On cross-examination she testified that she was not positive which pronoun, "I, she, they," Benjamin had used, but that her general impression was that he was involved. She also confirmed that she has never testified that Benjamin said anything about Erika not being involved.

In its closing remarks in Erika's trial, the State argued:          \

> Melissa Seling was called to the stand Friday by the defense. She was a defense witness. Melissa Seling told you that she wasn't drinking that night, and that's uncontradicted. But B.J. was.

* * *

Melissa was told that there has been another couple there a couple of nights before who tried to rip them off, and she told you that the

defendant's husband said either I killed, she killed, or we killed, she wasn't sure which. Now, granted on one occasion she said I killed, quoting the husband. On another occasion she said we killed. Because of that contradiction, Det. Case told you that he asked her to clarify that, and then that's when she came back and said I killed, we killed, she killed, she wasn't sure.

The main thrust of the State's closing argument, however, was that the two were working as a team:

These two people are working as a team, ladies and gentlemen. Erika, the defendant in this case, and B.J. Sifrit were working as a team. They worked as a team all week long. They were working as a team when they broke into Hooters. They were working as a team, we know, when they lured Melissa back to the unit, and I would submit, ladies and gentlemen, they were working as a team when they got Josh and Geney back to the unit and ultimately killed them. Why invite two people back to your unit, your room, if you're completely innocent of what had happened a few nights before? Why would you ask two people to come back there and risk being harmed? If your husband is the bad guy, if your husband is the murdering son-of-a-gun that did this, why would you invite another couple to come there? It's an easy answer. Because you participated in it. You got a rush. You wanted them to come back. You wanted another rush.

Based on our review of the record, we find no inconsistency in the State's position in the two cases. Melissa's testimony, while at times confused regarding whether Benjamin said "I killed, she killed or they killed," was fundamentally consistent throughout both trials. She may have been confused at various times regarding the pronoun used, however, she was clear that her impression of Benjamin's comments that night was that Benjamin had participated in the murder. She did not testify that anything that night led her to believe Erika was not involved, nor has the State ever taken this position. We find no inconsistency in the State's position sufficient to justify concluding that a due process violation occurred.

---

[18]    From a practical standpoint, the *Nguyen* court noted:

Nor is it shocking or even unusual that the evidence came in somewhat differently at each trial. Any lawyer who has ever tried a case knows that trial preparation is not a static process. As a case evolves, new witnesses come forward; others become unavailable. As new evidence is uncovered, other evidence loses its significance. What is received in evidence by stipulation in one trial might draw vigorous objections in another.

*Nguyen*, 232 F.3d at 1240.

[19]     The State's actual argument in Benjamin's trial regarding the weapon was, in part, that "Benjamin Sifrit, the defendant, controlled both guns on various occasions" and that the gun "was purchased by the defendant. He picked it out for his wife, and yet he would have you believe that he never fired it."

[20]     In Benjamin's trial the State argued:

I will never know and you will never know who pulled the trigger on that gun that night, but one thing is for certain: they were both there and they both-whichever one of them didn't pull the trigger aided and abetted the murder by helping the other one.

In Erika's trial the State argued:

No one in this room will ever know who did what to whom that night. There's certainly inferences to be drawn from the facts in this case, and the State has argued those inferences to you, but none of us will ever know definitively what happened in that room, but it's clear that the defendant was there. It's clear that the defendant participated to the extent of luring these people up there. She aided and abetted the crime of murder, which makes her guilty of the crime of murder.

Paper No. 11, Ex. 18, p. 17-24.

It is undisputed that "[a] fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Likewise, it has long been held that prosecutors are held to a high standard of fairness. *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest,

therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

The Court finds no prejudicial misconduct on the part of the prosecutor that unlawfully burdened Petitioner's rights and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010). In the Fourth Circuit, in order to reverse a conviction based upon prosecutorial misconduct, "the defendant must show (1) 'that the prosecutor's remarks or conduct were improper' and (2) 'that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial.'" *Caro*, 597 F.3d at 624-25.

As discussed thoroughly by the Maryland Court of Appeals, federal courts in applying due process standards to claims of inconsistent prosecutions have found that there are situations where the prosecution is prohibited from asserting inconsistent positions in separate criminal proceedings, based on the defendant's right to due process of law. However, "[t]o violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime." *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.2000). No such inconsistency exists in the present case. From the beginning of both Petitioner and Erika Sifrit's prosecutions, the government consistently asserted one theory of the case-that both defendants acted in concert to murder Joshua Ford and Martha Crutchley— and that no one would ever know, aside from Petitioner and his wife, what precisely transpired that night. What the prosecution consistently demonstrated was that Petitioner and Erika Sifrit worked in concert in murdering the victims and attempting to cover up the crimes. While the prosecutor highlighted and emphasized different evidence in Petitioner's trial than in Erika Sifrit's trial, the evidence highlighted did not go to the core theory of the case and as such did not deprive Petitioner of a fair trial. *See*

20

*Bradshaw v. Stumpf,* 5454 U.S. 175, 187 (2005) (Petitioner's assertions of inconsistency

in prosecution went to facts immaterial to Petitioner's conviction).[2] Assuming, arguendo,

that the applicable law is clearly established by the Supreme Court, this Court agrees with

the Maryland Court of Appeal's determination that Petitioner was not denied due process.

 Moreover, after careful review of the record, this Court finds that the Maryland Court of

Appeal's findings concerning the facts developed at each trial and the emphasis placed

thereon by the prosecution are supported by the record, and are therefore deemed

presumptively correct pursuant to 28 U.S.C. § 2254(d) and (e).  Accordingly, the

determination of the Maryland Court of Appeals shall not be disturbed here.

## Conclusion

In light of the ruling of the Court,  the instant Petition for habeas corpus relief will be

denied, and this case will be dismissed by separate order.


Date:  OCTOBER 21, 2010                    _____
                                           RICHARD D. BENNETT
                                           UNITED STATES DISTRICT JUDGE

---

[2] Respondents maintain, *inter alia,* that there is no applicable law concerning inconsistency in prosecutions established by the Supreme Court and as such Petitioner's claim should be rejected.  Paper No. 11.  See *Bradshaw,* 545 U.S. at 190 ("This Court has never hinted much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.") (Thomas, concurring).  *See also, Fotopoulos v. Secretary, Department of Corrections,* 516 F. 3d 1229. 1235 (11th Cir.) (noting that it would be "fanciful to suggest" that *Bradshaw* should control a state court decision that became final several years prior to the issuance of that opinion, and also that "the *Bradshaw* Court did not hold that use of inconsistent theories in the prosecution of two defendants violates the right to due process."